498

In the Matter of the Application of THE PEOPLE OF THE STATE OF NEW YORK, by GEORGE S. VAN SCHAICK, as Superintendent of Insurance of the State of New York, for an Order to Take Possession of the Property of and Rehabilitate the LAWYERS TITLE AND GUARANTY COMPANY.

In the Matter of the Application of CITY BANK FARMERS TRUST COMPANY Respecting Bond and Mortgage WILLIAM AND BEAVER CORPORATION Guaranteed by the LAWYERS TITLE AND GUARANTY COMPANY.*

Supreme Court, New York County, November 23, 1933.

* Opinion on reargument, 150 Misc. 174.    See, also, *Matter of Central Hanover Bank & Trust Co.* (149 id. 488); *Kline* v. *275 Madison Ave. Corp.* (Id. 747).

500

*Mitchell, Taylor, Capron & Marsh [Edwin W. Cooney and Edward L. Hunt, Jr., of counsel], for the petitioner.*

*Greenbaum, Wolff & Ernst [Lawrence S. Greenbaum of counsel], for George S. Van Schaick, as rehabilitator of the property of the Lawyers' Title and Guaranty Company.*

FRANKENTHALER, J.   This is a motion by the City Bank Farmers Trust Company (hereinafter referred to as the "petitioner"), to compel the Superintendent of Insurance, as rehabilitator of Lawyers Title and Guaranty Company (hereinafter termed the "company"), (1) to elect as to whether he intends to adopt or reject a contract entered into between petitioner and the company guaranteeing payment of a bond and mortgage owned by petitioner, and (2) to pay over to petitioner all rents collected by the company from the owner of the mortgaged property.

Petitioner owns three bonds and mortgages covering property at 2–26 South William street and 38–56 Beaver street, New York city.   Two of the bonds and mortgages were made by Kerr Realty Corporation, as mortgagor, and were acquired by petitioner on

June 3, 1930, through an assignment from Seamen's Bank for Savings. The third was executed on the same date by William and Beaver Corporation, the present owner of the mortgaged premises, as mortgagor, to petitioner, as mortgagee. By an agreement dated June 3, 1930, all three mortgages were consolidated into a single first mortgage in the principal sum of $3,000,000 maturing June 1, 1933, and bearing interest at the rate of six per cent per annum.

Contemporaneously with the assignment of the two mortgages, the making of the third, and the consolidation of the three, the company executed and delivered to petitioner its guaranty (1) that interest would be paid to petitioner at the rate of five and one-half per cent per annum within five days after it should have become due under the bond and mortgage, and (2) that principal would be paid as and when collected by the company, but in any event within eighteen months after the maturity of the bond and mortgage and demand of payment by petitioner.

The guaranty contains the following provision: " By the acceptance of this policy the Company is irrevocably appointed the exclusive agent of the assured at its own expense to sue for and receive the proceeds of any policy of Title Insurance and of any policy of Fire Insurance covering the mortgaged premises and to collect the interest on the bond and mortgage hereby guaranteed and to exercise every option or privilege in said bond and mortgage or either of them contained and given to the mortgagee; and the assured agrees until the breach or termination of this guarantee to refrain from exercising any such option or privilege and from collecting any part of said interest or of the principal secured by said bond and mortgage except through the Company and to permit the Company to retain as its premium for this guarantee all interest collected in excess of the rate guaranteed above.

" *This policy is subject to the agreements, conditions and general provisions hereto annexed and to such others as may be endorsed hereon and signed by an officer of the Company, all of which are hereby made a part of this contract.*" (Italics the court's.)

The " agreements " referred to include covenants by the company " to institute and conduct as and when it may deem expedient but without expense to the assured all such proceedings as may be necessary to enforce payment of said Bond and Mortgage or the fulfilment of the other covenants and agreements contained therein " and " to require the owner * * * to pay all such Taxes, Assessments and Water Rates * * * as by the terms of the mortgage are required to be paid."

The " conditions " annexed to the guaranty and incorporated

therein by the italicized language quoted above consist of covenants by petitioner, of which the following are important:·

" *Third.* To permit the Company, and the Company is hereby authorized without further action by the assured, at any time when the said bond and mortgage shall become due, either by the terms thereof or by reason of the exercise of any option given therein to the mortgagee, to enforce payment of the same in the name of the assured, by its own agents and attorneys but without expense to the assured either by foreclosure or otherwise; and on notice from the Company to produce and deposit with it for that purpose the bond and mortgage, all securities collateral thereto and all muniments of title relative thereto held by the assured, and to execute and verify such proofs and pleadings as may be required by the Company in the course of such proceedings, and out of the proceeds of such action to permit the Company to receive so much as may remain after paying to the assured whatever may be due the assured for principal and interest at the rate hereby guaranteed.

" *Fourth.* To permit the Company to buy in the property covered by said bond and mortgage and to take title thereto in the name of the assured, in case at any sale of said property in any foreclosure suit brought by the Company no bid shall be received for said property sufficient to cover the amount of the judgment and the expenses of the sale.   In case the said property shall be so purchased by the Company in the name of the assured, the Company shall be entitled, upon paying the assured, or the executors, administrators, successors or assigns of the assured, within the time limited in the foregoing policy, the amount of the principal guaranteed by this policy, together with interest thereon at the rate hereby guaranteed (in so far as the same has not already been paid), to the conveyance of the said property to it or its nominee by the assured or the heirs, devisees, or successors of the assured free and clear of all claims, charges and liens thereon created by the assured since the purchase thereof upon the said foreclosure and to an assignment of the deficiency judgment entered in said foreclosure action.   Until such payment or until the time shall have expired within which same may be made by the Company, the Company shall be entitled to the possession and management of the said property and to control the leasing, repairs and maintenance and insurance thereof at its own expense and to receive the rents and profits thereof, but at all times the liability of the Company under this policy shall continue until the assured shall have received the full amount of the principal guaranteed hereby with interest thereon at the rate guaranteed hereby."

On December 1, 1932, the company, though it failed to collect

from the owner of the mortgaged property the interest amounting to $90,000 due that day, paid to petitioner from its own funds $82,500, representing interest at the guaranteed rate. As a result of negotiations which ensued between the company and the owner, the latter appointed a new agent to operate the property and agreed to turn over to the company the net income received from the agent without deduction for taxes. Pursuant to this agreement the owner, between January 4, 1933, and May 6, 1933, paid to the company the sum of $55,161.12, which the company used to partially reimburse itself for the $82,500 previously paid out of its own funds to petitioner. On June 1, 1933, the owner of the property failed to pay the interest and principal due on that date, amounting to $90,000 and $3,000,000, respectively. The company, in turn, has made no payment to petitioner on account of said interest or principal. Although it has eighteen months within which to pay the principal under its guaranty, it is clearly in default as to the June, 1933, interest, amounting at the guaranteed rate to $82,500. Between June 1, 1933, and October 4, 1933, the company has received certain payments from the owner of the property aggregating $31,232.62. Of this sum $23,424.48, representing seventy-five per cent thereof, has been paid to petitioner, and the balance, amounting to $7,808.14, has been retained as a reserve for arrears of taxes. No taxes have been paid for the year 1932 or for the year 1933. The unpaid taxes, exclusive of those due on November 1, 1933 (which is subsequent to the return date of the present motion), total more than $130,000.

As a result of repeated requests by petitioner that the company proceed to foreclose the bond and mortgage, such action was finally determined upon by the latter. However, before a foreclosure suit was commenced, the company, by order of this court, dated August 11, 1933, was placed in the hands of the Superintendent of Insurance for the purpose of rehabilitation. The Superintendent has taken the position that the company's guaranty is conditioned upon the continuance of its exclusive agency in respect to the administration and enforcement of the bond and mortgage and that the agency cannot be canceled without terminating its liability upon its guaranty. Although the Superintendent is still retaining and continuing to exercise all the rights conferred upon the company by the exclusive agency, he has failed to pay the guaranteed interest which became due in June, 1933, or to make any other payments on account of the guaranty.

Petitioner contends that the Superintendent may not receive all the advantages and privileges flowing from his control of the bond and mortgage without assuming the obligations and burdens

of the guaranty. The status of the Superintendent as rehabilitator of the company is claimed to be analogous to that of an equity receiver who must determine within a reasonable time after his appointment whether he will adopt or reject executory contracts entered into prior to the receivership.

Accordingly, petitioner asks that the Superintendent " shall be required forthwith either:

" (a) To recognize that the agency of said Company has terminated and that your petitioner may proceed to foreclose said mortgage without prejudice to said agreement of guaranty and your petitioner's claims thereunder * * *; *or*

" (b) To forthwith perform the obligations of the said Company under its said guaranty policy in consideration of deriving the benefits of the exercise of the agency functions bestowed upon the said Company by said policy." (Italics the court's.)

It is clear from the foregoing quotation that petitioner is seeking alternative relief and that it is satisfied with either of the two remedies suggested. Keeping this in mind it becomes manifest that there is no necessity whatsoever for compelling the Superintendent to make an election between rejection and adoption of the contract of guaranty. Upon a motion involving a guaranty issued by the New York Title and Mortgage Company, decided simultaneously herewith (*Matter of Central Hanover Bank & Trust Co.*, 149 Misc. 488), this court has held that it is an *implied* condition of the continued existence of the guarantor's exclusive agency that the latter continue to perform its guaranty. The guaranty in the instant case differs from that involved in the proceeding referred to in that it contains an *express* provision that the owner of the bond and mortgage shall be obliged to refrain from interference with the guarantor's control or enforcement thereof only " until the breach or termination of this guarantee." It follows that the conclusion reached regarding the guaranty of the New York Title and Mortgage Company, viz., that the guarantor's right to retain exclusive control of the bond and mortgage ceases upon its failure to perform the guaranty is applicable with even greater force to the guaranty under consideration upon the present application. For the reasons stated in the opinion filed in the other proceeding, petitioner, in view of the default under the guaranty as to the June, 1933, interest, may exercise all the rights of a mortgagee in connection with its bond and mortgage without prejudicing such rights as it may possess to enforce the guaranty or to recover for its breach. Under these circumstances it is apparent that petitioner needs no decree of this court directing the Superintendent to choose between (1) permitting petitioner to enforce the bond

and mortgage without affecting its claims upon the guaranty, and (2) adopting the contract of guaranty. Petitioner is entitled to the former relief without any election by the Superintendent and, should the latter decide to elect, regardless of what his election may prove to be. If the Superintendent rejects, petitioner's right to enforce the bond and mortgage without prejudicing its claim upon the guaranty is not affected. If, on the other hand, the Superintendent attempts to adopt, petitioner may validly refuse to recognize the adoption and insist that the company's agency terminated upon its default under the guaranty. Of course, if the Superintendent were to choose to adopt the guaranty, petitioner could acquiesce in that decision and waive its right to regard the company's exclusive agency as terminated. No proper case for *requiring* an election is, however, presented where the party directed to elect has no right to either of the alternatives offered to him for choice. That is the situation here. The Superintendent may not, except with petitioner's consent, retain control of the bond and mortgage after default upon the guaranty, whether he adopts or rejects the guaranty. It is accordingly unnecessary to consider whether the principle that a receiver may be compelled to elect whether to reject or adopt executory contracts is applicable to the Superintendent of Insurance as rehabilitator, and there is likewise no need for determining at this time whether the principle extends to contracts such as the guaranty in the case at bar.

We turn now to that branch of the application which seeks a direction that the Superintendent turn over to petitioner the net income of the mortgaged property collected from the owner since December, 1932. Petitioner contends that these moneys are the property of petitioner and constitute trust funds, that the company had no right to apply them in partial reimbursement of the interest which it had paid to petitioner on its guaranty on December 1, 1932, and that petitioner is entitled to a summary order, in the nature of an order of reclamation, commanding the payment of the money to petitioner even if the company failed to keep the same segregated and mingled it with its other funds.

There can be no doubt, in the absence of an express provision to the contrary, that the net income of the mortgaged property, when paid by the owner to the company, becomes the property of petitioner. The company, by the very terms of its own guaranty, acts as " agent " of petitioner. The ownership of the bond and mortgage remains at all times in petitioner. Payments of interest under the bond and mortgage belong to petitioner as the proceeds of its own bond and mortgage. If the owner, instead of paying interest, turns over to the company all the net rents and profits of

the mortgaged premises, the conclusion can be no different. In either event, the company is collecting as " agent " and the collections are the property of the principal. The guaranty expressly permits the company " *to retain* " as its premium all interest collected in excess of the guaranteed rate. The very wording of this provision, prepared by the company, confirms the view that title to the funds received by virtue of the bond and mortgage is vested in petitioner. Otherwise, the guaranty, instead of authorizing the company to " *retain* " a specified portion of the collections, would have provided merely for payment by the company of interest at the rate of five and one-half per cent per annum. The use of the word " retain " indicates that what is not retained is to be paid over to petitioner. The contract of guaranty will be searched in vain for even a suggestion that the company may keep for itself the interest paid to it or rents collected by it from the owner. There is a provision in paragraph " fourth " of the " conditions " which appears to be intended to give the company the right, *under certain circumstances*, to keep the rents and profits of the mortgaged premises as its own. " Until such payment or until the time shall have expired within which same may be made by the Company, the Company shall be entitled to the possession and management of the said property and to control the leasing, repairs and maintenance and insurance thereof at its own expense and to receive the rents and profits thereof, but at all times the liability of the Company under this policy shall continue until the assured shall have received the full amount of the principal guaranteed hereby with interest thereon at the rate guaranteed hereby."

The context clearly indicates, however (see paragraph fourth as quoted in its entirety, *supra*), that the language above quoted applies only to a situation where the mortgage has been foreclosed and the property purchased in the name of petitioner. The provision was obviously intended to give the company the right to any rents collected *after petitioner became the owner of the property* and until payment of the balance due to petitioner under the guaranty either during or at the expiration of the eighteen months' period of grace. The words " until such payment " refer to the payment mentioned in the preceding sentence of paragraph " fourth," namely, the payment to be made in return for a conveyance of the property by petitioner, as the owner through purchase at foreclosure sale. The fact that the only provision in the entire guaranty which purports to permit the company to retain for itself the rents and profits of the mortgaged premises is contained in a paragraph dealing solely with situations arising after foreclosure sale tends strongly to negative any thought that the company was

to have the same rights in respect of rents collected before a foreclosure action was even commenced. The significance of this circumstance is enhanced when it is remembered that the guaranty was prepared by the company and must, therefore, be construed most strongly against it.

As the rents collected by the company from the owner of the mortgaged premises were the property of petitioner, the company had no right to use them for the purpose of partially reimbursing itself for the interest of $82,500 which it had paid to petitioner in December, 1932, out of its own funds. The mortgaged property constitutes part of the collateral held by petitioner to secure the payment of the indebtedness evidenced by the bond, together with interest thereon. The rents and profits of the mortgaged premises are in the same category. As a guarantor may resort to the collateral held by the creditor only upon the principle of subrogation, the company's right to pay to itself the rents received from the mortgaged premises can be sustained, if at all, only upon that principle. It is well established, however, that the right of subrogation does not arise until the guarantor has paid the guaranteed indebtedness in its entirety.

" The claim of the creditor must be fully satisfied before there can arise any equity of subrogation. The creditor's right to the possession of all the securities is superior to the equity of the surety or guarantor and the creditor is not obliged to suffer the inconvenience or risk of parting with any of his resources until the debt is paid in full, unless the creditor consents. ' When his debt has been only partially paid, it would be unreasonable to hold that the third party who made such payment thereby acquired a precedence over him, or was even placed on an equal footing, in reference to the security for the payment of the remainder of his debt.' * * * The same principle applies when the creditor has security for a debt payable by installments and a surety is personally bound for one installment." (Stearns Suretyship [3d ed.], § 245.)

In *McGrath* v. *Carnegie Trust Co.* (221 N. Y. 92) we find the following apt statement of the same doctrine in the opinion of Judge Cardozo (p. 95): "A creditor may not be required to surrender any part of his collateral till payment has been made in full (*People* v. *Remington & Sons*, 121 N. Y. 328, 333; *Evertson* v. *Booth*, 19 Johns. 486). If the makers had paid in full, a different question would be here. The right of action against the trust company might then pass to them by subrogation as equitable assignees (*Dunlop* v. *James*, 174 N. Y. 411; *Twombly* v. *Cassidy*, 82 N. Y. 155). But the equity of subrogation does not arise until the whole debt has been discharged (*Columbia F. & T. Co.* v.

*Kentucky Union Ry. Co.*, 60 Fed. Rep. 794, 796; Sheldon on Subrogation, § 127)."

In *Hanlon* v. *Union Bank of Medina* (247 N. Y. 389) the Court of Appeals pointed out that there is no right to *pro rata* or partial subrogation (p. 390): "As for the plaintiff she might doubtless, on paying this entire indebtedness, insist that she be subrogated to the bank's title to the collateral mortgage. Clearly this was the extent of her rights. She could not demand any *pro rata* or partial subrogation. (*McGrath* v. *Carnegie Trust Co.*, 221 N. Y. 92.)" Even a "surety liable only for part of the debt does not become subrogated to collateral or to remedies or rights available to the creditor, unless he pays the whole debt or it is otherwise satisfied." (*Mellette Farmers' Elevator Co.* v. *Poehler Co.*, 18 F. [2d] 430, 431.)

It follows that until and unless the company has paid petitioner all the principal and interest due under its guaranty, it has no right to resort for its own purposes to petitioner's bond and mortgage or to the income derived from the mortgaged premises.

Counsel for the Superintendent of Insurance attempt to justify the company's appropriation to itself of the payments received from the owner of the property on the basis of the principle that a surety's right to indemnity from the debtor, as distinguished from its right of subrogation to securities held by the creditor, may be asserted against the debtor even though the surety has paid only part of the indebtedness. It is true that a "guarantor or surety may compel the principal to reimburse him by an action at law for any portion of the obligation paid by the former. This differs from the right of subrogation, which does not arise until the principal's debt is wholly discharged." (Arnold Suretyship & Guaranty, § 160, p. 253.) The doctrine of indemnity does not, however, avail the company in the instant case for two reasons.

In the first place the right to indemnity against the principal arises only when the surety became such at the request, express or implied, of the principal, as, for example, in the case of an accommodation indorser.

"A surety cannot ordinarily recover indemnity from the principal, unless he became surety at the request of the principal, either express or implied." (Brandt Suretyship & Guaranty, § 231, p. 463.)

" Promise of indemnity will not be implied where the surety or guarantor is a mere volunteer, and signs without request of the principal." (Stearns Suretyship, *supra*, § 279, p. 506.)

" It is recognized that a surety who has become such without the request of the principal, express or implied, cannot have the aid of a law court to obtain reimbursement, * * *. *And the fact that the obligation of the guarantor was beneficial to the principal*

*does not permit the inference that he requested the former to sign. The express request, or circumstances from which one may be implied, must be shown.*

" In this respect, indemnity differs from subrogation; for if a surety becomes bound against the wish of the principal, he is entitled to be subrogated to the rights of the creditor against the principal. Subrogation is not founded upon a promise but exists because of the relation of the parties, while the right of indemnity rests upon a contract, express or implied." (Arnold Suretyship & Guaranty, *supra*, § 157, p. 249.) (Italics the court's.)

To the same effect see 50 Corpus Juris, 249, section 404.

In the instant case there is no evidence whatsoever that the company executed its guaranty to petitioner at the express or implied request of William and Beaver Corporation, the owner of the mortgaged property. The mere fact that the guaranty was made at the same time as the execution of the June 3, 1930, mortgage and the consolidation agreement is insufficient in itself to raise such an inference, especially since petitioner, in consideration of the guaranty, was obliged to pay a premium and confer various rights and privileges upon the guarantor. The natural inference is that the guaranty was executed at the request of petitioner and not at the solicitation of the owner of the mortgaged property.

In the second place, an assumed right to indemnity would not justify the company's payment to itself of the rents received from the mortgaged premises. The doctrine of indemnity is distinguished from that of subrogation in that the former merely permits the surety to recover from the debtor, whereas the latter authorizes the surety to obtain for itself collateral held by the creditor. This very distinction is pointed out and discussed in several of the cases cited on behalf of the Superintendent of Insurance (*Mellette Farmers' Elevator Co.* v. *Poehler Co.*, *supra*, at p. 431; *Nettleton* v. *Ramsey County Land & Loan Co.*, 54 Minn. 395, 397; *Fender* v. *Fender*, 30 Ga. App. 319, 321, 322). The right to indemnity does not include or authorize resort to collateral held by the creditor. It merely permits recourse to the debtor. The rents received by the company from the owner of the mortgaged premises constitute the proceeds of petitioner's collateral and they cannot, therefore, be appropriated by the company on the theory of indemnity.

The company's use of the rents to reimburse itself is also sought to be defended upon the theory that the doctrine that there may be no *pro tanto* subrogation does not apply to the case at bar because the company " has made no attempt to seek a *pro rata* interest in the mortgage or proceeds on foreclosure held by petitioner," and

has in no way challenged petitioner's paramount right in the whole mortgage as security for the debt. As the value of the mortgaged property is predicated chiefly, if not entirely, upon the income which it produces by way of rents and profits, it must be manifest that the company's appropriation of such income *does* constitute a *pro tanto* transfer to the company of petitioner's security. The cases cited by counsel for the Superintendent fail to support his contention. In *Fender* v. *Fender (supra)* the surety sued the debtor to recover matured installments of the indebtedness which the surety had paid. The court, in holding that a good cause of action was stated, was careful to point out that the action did not involve any attempt to affect or disturb the securities held by the creditor. Although the word "subrogation" was used by the court, the context indicates clearly that it was employed in the sense of indemnity. In *Nettleton* v. *Ramsey County Land & Loan Co. (supra)* the indorser of one of a series of notes secured by a mortgage sued a grantee of the property, who had assumed the indebtedness, to recover the amount of the note paid by the indorser. Although the word "subrogation" was employed repeatedly in the opinion, the court clearly had in mind indemnity and not subrogation in the strict sense. Indeed, the opinion (p. 397) contains the express statement that "the remedy sought is upon the promise or contract of the principal debtor to pay an entire debt payable in installments, and not the apportionment or application for his benefit of securities in the hands of the creditor."

Nor is there any merit to the contention raised by counsel for the Superintendent that the company on payment of an installment of interest under its guaranty became invested with a *quasi* contractual right to reimbursement from the principal, quite apart from the fact that even this right would afford no sanction to an appropriation of the proceeds of petitioner's collateral.

In the court's opinion the company had the right to use interest paid to it or rents collected by it for the purpose of making payments *to petitioner* as required by its guaranty. It had no right, however, to use such funds for the purpose of making payments *to itself* in reimbursement of payments previously made by it upon the guaranty out of its own funds. The rents or income collected during each half year are to be regarded as security for the payment of the installment of interest or principal falling due at the end of that half year and not for the payment of prior defaulted installments. If the rule were otherwise and the company could use current income to repay itself for previous payments on its guaranty, the guaranty, instead of constituting security additional to the mortgage itself, would to that extent take the place of the mortgage.

The claim is made, in opposition to the present application, that petitioner may not assert a right of reclamation without tracing the rents collected by the company into a separate and identifiable fund. It has already been pointed out that the collections made by the company constitute the latter a trustee for petitioner and that the relationship is not one of debtor and creditor. The funds are the property of petitioner and the latter's right to claim them is not destroyed merely because the company mingled them with its other funds. " ' The mere mingling of funds which are to be devoted to a specific purpose with other funds of the depositary does not destroy the right of the true owners to claim such specific funds ' (*Brown* v. *Spohr*, 180 N. Y. 201, 212; *Van Alen* v. *American Nat. Bank*, 52 N. Y. 1; *Central Nat. Bank* v. *Conn. Ins. Co.*, 104 U. S. 54)." (*Matter of International Milling Co.*, 259 N. Y. 77, 82, 83.) In the *International Milling Co.* case the Court of Appeals affirmed an order granting a summary application to compel the Superintendent of Banks, as liquidator of the Bank of United States, to pay over a sum of money collected by the bank as agent for the applicant and claimed to constitute trust funds, despite the fact that they were not traced into a separate and identifiable fund. Of course, as the Court of Appeals there observed, the situation might be different if " the funds in the hands of the liquidator might appear insufficient to meet the claims of petitioner and others similarly situated " (p. 85). Lest this be the situation here, the Superintendent of Insurance will be given an opportunity upon the settlement of the order to be entered hereon to submit affidavits showing the total amount of claims existing against the company for the return of trust funds and the aggregate amount of assets available to meet them. In view of the fact that additional rents may have been collected and expenses incurred since the filing of the papers used upon this motion, affidavits will also be received upon the settlement of the order as to the amount of rents which petitioner is entitled to receive from the Superintendent in accordance with this opinion.

The motion is granted to the extent of directing the Superintendent to pay over to petitioner the rents and profits received by the company or by the Superintendent from the owner of the mortgaged property. Settle order.